Filed 6/22/22  P. v. Alvarez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. DOUGLAS ALVAREZ, Defendant and Appellant. | B308669 (Los Angeles County Super. Ct. No. BA234059) |

APPEAL from an order of the Superior Court of the County of Los Angeles, Stephen A. Marcus, Judge.  Affirmed.

Michele A. Douglas, under appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Douglas Alvarez appeals from the trial court's denial of his Penal Code section 1170.95[1] petition for resentencing. We affirm.

# II. BACKGROUND[2]

"Annice Waldrop [was] sitting in a car with [Charles] Keaton [(the victim) near] Westlake and Maryland Streets [o]n the afternoon of November 20, 2001. [The victim] wanted to purchase drugs before they left. []Aguilar approached the car and asked if they wanted to buy something. []Waldrop said, "'A nickel.'" As soon as []Aguilar stepped toward the car with the cocaine base in his hand, police officers came out of the alley. []Aguilar dropped the cocaine base to the ground. [The victim] began eating crackers. The officers ordered []Aguilar to the sidewalk area [and] . . . told [him] to turn around and put his hands on his head. [¶]

"One of the officers approached the car . . . [and] asked [the victim] and []Waldrop what they were doing. They told the officer they were trying to sell []Aguilar a Walkman. The officer asked, "'What else are you guys doing?'" The officer shined his flashlight on the ground, stating, "'Well, what is that?'" [The victim] told the officer it was part of the crackers he was eating.

---

[1]   All further statutory references are to the Penal Code.

[2]   The following is taken from the unpublished opinion in the direct appeal from defendant's judgment of conviction. (*People v. Alvarez* (Aug. 4, 2005, B176679) (*Alvarez*).)

The officer ran his foot across the cocaine base, grinding it into the ground.  [He] then told []Waldrop and [the victim] to leave.  [¶]

"A short time later, []Waldrop and [the victim] encountered []Aguilar again.  [He] began swearing at []Waldrop[,] . . . ask[ing], "'Why did [she] do his stuff like that[?]'"  []Aguilar [then] slapped []Waldrop in the jaw.  [The victim] intervened, saying:  "'That's my daughter, why are you hitting her?  She is a girl.'"  []Aguilar whistled for assistance from nearby gang members.  Three individuals ran up and grabbed []Aguilar, telling him, "'Leave [the victim] alone.'"  The individuals told [the victim] and []Waldrop to leave.  [¶]

"When []Aguilar was released, he ran across the street[,] . . . grabbed a weight belt[,] and began swinging it at [the victim].  [The victim] grabbed a telephone and struck []Aguilar.  The three [gang members] again restrained []Aguilar and told [the victim] and []Waldrop to leave.  []Waldrop and [the victim then] left.  [¶]

"[]Waldrop rented a room so that [the victim] would have a place other than his car to stay that night.  However, [she] was unable to find [the victim] later that evening.  []Waldrop learned of [the victim]'s death at approximately 4[:00] a.m. the following morning when she returned to his car.

"[]Waldrop knew []Aguilar . . . [because she] had stolen items from stores and sold them to [him].  []Waldrop had also seen [defendant] selling drugs in the neighborhood.  [She] positively identified []Aguilar from a photographic lineup shown to her by the police as the man who fought with [the victim].  [She] also identified [defendant] from a photographic lineup as someone from whom she had purchased drugs in the neighborhood.  []Waldrop was fearful about identifying []Aguilar

3

because she believed he might hurt her or her family. [She] told [Los Angeles Police Department] Detective Breuer, "'Oh my God, they're going to get me.'" An audiotape of Detective Breuer's interview of []Waldrop was played for the jury at trial and admitted [in] evidence.

"On November 21, 2001, James Polk was [near] Westlake and Maryland Streets acting as a lookout for individuals selling drugs. This was during the early morning hours after the altercation involving []Waldrop, [the victim], and []Aguilar. []Polk saw defendants walking toward him. At that time, []Polk did not know []Aguilar. [But he] knew [defendant] was a drug dealer and narcotics 'enforcer' in the area. []Polk heard []Aguilar ask [defendant] in Spanish, "'Is that him there?'" [Defendant] responded, "'No.'" [¶]

"[]Aguilar and [defendant] continued walking up the hill towards an alley. []Polk walked to the opposite sidewalk where he spoke to some other people. []Polk asked if they knew the identity of []Aguilar who was accompanying [defendant]. []Polk saw [the victim] walk towards a little 'hooch' in the alley. [The victim] repaired radios and televisions in the structure. Within seconds, []Polk heard what sounded like two or three gunshots from the direction of the alley. When []Polk looked up, he saw flashes coming from within the alley. []Polk crossed the street and called the police.

"[]Polk knew Carlos Medrano who also worked as a lookout for drug traffickers in the area of the alley. []Medrano usually stayed in the dumpster area. [He] was standing behind the dumpster on the morning [the victim] was killed. At trial, []Medrano stated he lied to the police when he was questioned

later that morning because he was 'very drugged' and wanted to get released.  [¶]

"[]Medrano told the police [defendant] and []Aguilar walked up to the roof of an apartment building.  Thereafter, a Black man walked up the alley.  The two men came down to the alley.  . . . []Medrano related [to the police] that []Aguilar said to the Black man, "'What's up, [racial slur]?'"  []Aguilar then raised a gun and shot the Black man in the head.  Two or three shots were fired.  When first interviewed, []Medrano told the police the Black man fell to the ground screaming.  [¶]

"[]Medrano knew []Aguilar, [defendant], and [the victim].  []Medrano later identified []Aguilar (known as El Catracho) from a photographic lineup.  [He] told the police that []Aguilar shot the Black man.  []Medrano also identified [defendant] (known as Sureno) as the man who was with []Aguilar at the time of the shooting.

"Two audiotaped interviews of []Medrano's discussions with the police were played at trial.  Transcripts of the tapes were also provided to the jurors.  [¶]

"An autopsy revealed that [the victim] died as the result of a single gunshot wound to the head.  Bullet fragments recovered from [the victim]'s brain were later examined by a criminalist and were found to be fragments from a .38 caliber or [nine-]millimeter bullet.  [¶]  . . .  [¶]

"[Defendant] was arrested on November 30, 2001.  [He] had cocaine base in his mouth at the time.  . . .  Police recovered the following items during a search of [defendant's] apartment:  a holster; nine-millimeter ammunition; and .22 caliber ammunition.  The holster appeared to be for a small caliber gun such as a .22 caliber or .38 caliber." (*Alvarez, supra*, B176679.)

# III. PROCEDURAL BACKGROUND

A jury convicted defendant of first degree murder and found true the allegation that a principal personally used and discharged a handgun causing great bodily injury within the meaning of section 12022.53, subdivision (d). The jury was unable to reach a verdict on the allegation that the offense was committed for the benefit of a criminal street gang and the trial court declared a mistrial on that allegation.

The trial court sentenced defendant to 25 years to life in prison. In August 2005, the Court of Appeal affirmed the judgment of conviction.

On April 19, 2019, defendant filed a petition for resentencing under section 1170.95, asserting that he was not the actual killer. On May 21, 2019, the trial court appointed counsel to represent defendant. On June 17, 2019, the District Attorney opposed the petition, arguing that defendant had not been convicted under either a natural and probable consequences or a felony murder theory, but rather as a direct aider and abettor to the murder. On July 17, 2020, defendant filed a reply, arguing that his conviction was based on a natural probable consequences theory of culpability, which had been abolished by Senate Bill No. 1437 (Senate Bill 1437).

On October 7, 2020, the trial court conducted a hearing and denied the petition because the record of conviction, including the unpublished Court of Appeal opinion affirming the conviction, demonstrated that defendant was ineligible for relief as a matter of law.

# IV.   DISCUSSION

Defendant contends that because the prosecutor made comments during argument from which the jury could have inferred that it could convict defendant under a natural and probable consequences theory, he made a prima facie showing that he was eligible for resentencing.

## A.   *Background*

### 1.   Prosecutor's Arguments

During his closing remarks, the prosecutor discussed aiding and abetting and made the following comments:  "There is in your jury instruction an explanation of aiding and abetting a crime.  Before I get to it, just let me explain the principle.  [¶] Anyone who assists a person in the commission of a crime knowing that this person is going to commit a crime is equally guilty.  If you and I get together and you say, 'Listen, I want to go rob the 7-Eleven.  I need a ride.  Could you take me there?  [¶] 'And also after the crime I am going to need to get away, so could you stay there and wait for me and when I am done I will come out and you can take me away from the crime scene.'  [¶]  When that robbery takes place, when you go in and rob the 7-Eleven and you come out and I take you from the crime scene, I robbed the 7-Eleven.  There is no question—there shouldn't be any question because I am really one of the people who is really making this crime possible."

Shortly after making those comments, while still in closing, the prosecutor returned to the topic of aiding and abetting,

7

explaining: "And of course, I hope this makes common sense, that all of the people who assist and aid in the commission of a crime, in this case the murder, make it possible for it to occur. [¶] And so everybody is equally as guilty of committing the murder, not just the person who actually pulls the trigger, but everybody who made the crime possible with knowledge that the person who did the murder was going to go out and commit a crime. Not necessarily a murder, but some kind of violent assault."

During rebuttal, the prosecutor again addressed the concept of aiding and abetting, this time in the context of the facts of defendant's case: "[Defendant] does not need to know that []Aguilar is going to commit a murder. He has to only have knowledge of this criminal purpose; that is, to commit some act of violence against [the victim], and when the murder takes place that it is reasonably foreseeable that this sort of violence would take place. [¶] The only way [defendant] can get out of criminal responsibility is if you believe that he had no idea that []Aguilar was enlisting his help in order to commit an act of criminal violence against [the victim], and that is not a reasonable interpretation of the evidence."

Later in rebuttal, the prosecutor revisited the concept of aiding and abetting under the facts of defendant's case: "You would have to believe, in order to believe that [defendant] had no idea what was going to happen, that he believed that []Aguilar had some non-criminal, nonviolent purpose in attempting—in enlisting [defendant] to contact [the victim] at 3:00 in the morning. [¶] Was he going to counsel him? Did [defendant] reasonably believe that []Aguilar was going to come up and say, 'Hey, what you did was wrong and I would appreciate it if you didn't do it anymore'? [¶] It's not a reasonable interpretation.

8

[¶] [Defendant] knows how things work, and [he] knew that some act of violence, some act of retribution was in store for [the victim]."

2. Trial Court's Ruling

In denying the petition for resentencing, the trial court stated that it would "be denying [defendant's] request for relief . . . because the record of conviction demonstrates [defendant] is ineligible as a matter of law. [¶] . . . [¶] In order to be eligible for relief [defendant] must show that he was convicted under either a natural and probable consequence[] theory or felony murder theory. Obviously[, defendant] was not convicted of felony murder, nor was he convicted of the natural and probable consequence theory. [¶] Even [the] defense concedes the felony murder theory was not involved. Instead, the defense argued that it was a natural and probable consequence[] theory case. The biggest obstacle to this claim is the fact that the Court of Appeal directly made a finding that this was not a murder based on the natural and probable consequence theory. [¶] Contrary to what [defense counsel argued], . . . the appellate opinion is . . . one of the most important things, according to the most recent cases, that the court should consider." The court continued, "There is no jury instruction on [the] natural and probable consequence[] murder theory, and this is a deal breaker. It is not possible that this jury could have convicted this defendant . . . based on the natural and probable consequence theory. They did [not] have enough information to do that. It's impossible. [¶] Moreover, a few [un]artful sentences in a prosecutor's argument

9

[do] not provide a sufficient basis for the defense position, and the facts [do not] support it."

The trial court went on to explain an alternative basis for its ruling. "There is another aspect of this case which absolutely precludes [defendant from obtaining] relief under section 1170.95 as a matter of law. [¶] . . . [¶] Since the appellate court actually decided the issue of whether the natural and probable consequence theory of murder applied in this case, this becomes law of the case. [¶] Law of the case doctrine provides that a decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case. [¶] . . . [¶] The [appellate] court did rule on the legal issue, and this is, in fact, a subsequent proceeding in the same case. I am bound by the appellate court's ruling."

The trial court therefore denied the petition without issuing an order to show cause.

B.  *Section 1170.95*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 . . . , Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be

10

convicted under the law as amended to retroactively seek relief. [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

On October 5, 2021, the Governor signed Senate Bill No. 775 which amended section 1170.95 to permit resentencing of certain persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter . . . ." (§ 1170.95, subd. (a); see Sen. Bill No. 775 (2021–2022 Reg. Sess.), as amended Oct. 5, 2021, p. 3; Stats. 2021, ch. 551, §§ 1–2.) A petitioner who files a facially sufficient petition is entitled to the appointment of counsel and the opportunity for briefing. (§ 1170.95, subd. (c); see *Lewis, supra*, 11 Cal.5th at p. 957.)

When briefing has been completed, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).) Within 60 days of issuance of the order to show cause, the trial court shall hold a hearing "to determine whether the petitioner is entitled to relief." (§ 1170.95, subd. (d)(1) & (3).) "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).) The trial court acts as the finder of fact when determining whether the prosecution has met its burden beyond a reasonable doubt. (See *Lewis, supra*, 11 Cal.5th at p. 957; *People v. Gentile* (2020) 10 Cal.5th 830, 855 ["section 1170.95 requires the superior court

11

to determine on an individualized basis, after considering any new or additional evidence offered by the parties, whether the defendant is entitled to relief"].)

## C.  *Analysis*

The jury instructions on murder in defendant's case did not include instructions on felony murder or the natural and probable consequences doctrine.  The jury received instructions only on direct aiding and abetting[3] and the elements of malice murder.[4]

---

[3]     The trial court delivered CALJIC No. 3.01, which stated, "A person aids and abets the commission of a crime when he or she: [¶]  (1) With knowledge of the unlawful purpose of the perpetrator, and  [¶]  (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and  [¶]  (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.  [¶]  A person who aids and abets the commission of a crime need not be present at the scene of the crime.  [¶]  Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.  [¶]  Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

[4]     The trial court delivered CALJIC No. 8.10, which stated, "Defendant is accused in [c]ount 1 of having committed the crime of murder, a violation of [s]ection 187 . . . .  [¶]  Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder in violation of . . . [s]ection 187.  [¶]  In order to prove this crime, each of the following elements must be proved:  [¶]  1.  A human being was killed;  [¶]  2.  The killing was unlawful; and  [¶]  3.  The killing was done with malice aforethought.

12

The jury was also instructed on first degree murder.[5]  And, as noted above, the jury found defendant guilty of first degree murder.

---

The court also delivered CALJIC No. 8.11, which stated that "'[m]alice' may be either express or implied.  [¶]  Malice is express when there is manifested an intention unlawfully to kill a human being.  [¶]  Malice is implied when:  [¶]  1.  The killing resulted from an intentional act;  [¶]  2.  The natural consequences of the act are dangerous to human life; and  [¶] 3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.  [¶] When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.  [¶]  The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.  [¶]  The word 'aforethought' does not imply deliberation or the lapse of considerable time.  It only means that the required mental state must precede rather than follow the act."

[5]    The trial court delivered CALJIC No. 8.20:  "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree.  [¶]  The word 'willful,' as used in this instruction, means intentional.  [¶]  The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.  The word 'premeditated' means considered beforehand.  [¶]  If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or

Given the record, the jury necessarily found that defendant was convicted as a direct aider and abettor and intended to kill the victim. And, contrary to defendant's assertion, there is no probability that the jury could have convicted him under a natural and probable consequences theory, particularly as there was no instruction on that theory. Accordingly, defendant was ineligible for resentencing as a matter of law. (See *People v. Cortes* (2022) 75 Cal.App.5th 198, 205 [because the "jury was not instructed on any theory of liability for murder or attempted murder that required that malice be imputed to him" he was "ineligible for resentencing under section 1170.95, subdivisions (a) and (b)"]; *People v. Daniel* (2020) 57 Cal.App.5th 666, 677, review dism.)

---

other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

14

## V.    DISPOSITION

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

BAKER, J.

15